IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

**WILMINGTON SAVINGS FUND
SOCIETY, FSB, as successor in interest to
CHRISTIANA BANK & TRUST
COMPANY, as trustee for JOHN DOE
TRUST 1, *et al.*,**

                        Plaintiffs;

        v.

**PHL VARIABLE INSURANCE
COMPANY and PHOENIX LIFE
INSURANCE COMPANY,**

                        Defendants.

Civil Action No. 13-499-RGA

MEMORANDUM OPINION

David J. Baldwin, Esq., Potter, Anderson & Corroon, Wilmington, DE; John E. Failla, Esq.
(argued), Proskauer Rose LLP, New York, NY; Nathan R. Lander, Esq., Proskauer Rose LLP,
New York, NY; Phillip Hall, Esq., Highland, attorneys for the Plaintiffs.

Richard D. Heins, Esq., Ashby & Geddes, PA, Wilmington, DE; David T. McDowell, Esq.
(argued), Edison, McDowell & Hetherington LLP, Houston, TX; Kendall J. Burr, Esq., Edison,
McDowell & Hetherington LLP, Houston, TX; Bobby B. Debelak, Esq., Edison, McDowell &
Hetherington LLP, Houston, TX; John Beers, Esq., Phoenix Life Insurance Company, attorneys
for the Defendants.

April 9, 2014

*Richard G. Andrews*

ANDREWS, UNITED STATES DISTRICT JUDGE:

Presently before the Court for disposition is the Defendants PHL Variable Insurance Company and Phoenix Life Insurance Company's Motion to Dismiss the Second Amended Complaint. (D.I. 136). This matter has been fully briefed. (D.I. 137, 141, 142). The Court heard oral argument on December 16, 2013. (D.I. 149). For the reasons set forth herein, the Defendants' motion is **GRANTED IN PART and DENIED IN PART**.

## BACKGROUND

The trustee of sixty life insurance trusts, Wilmington Savings Fund Society, originally brought this suit on June 5, 2012 in the Central District of California. (D.I. 1). The suit was brought against The Phoenix Companies, Inc., Phoenix life Insurance Company ("Phoenix"), and PHL Variable insurance Company ("PHL"). *Id.* The case was transferred to the District of Delaware on March 28, 2013. (D.I. 76). The Plaintiffs then filed a Second Amended Complaint on July 28, 2013. (D.I. 130). The Second Amended Complaint did not include Phoenix Companies, Inc. or John Doe Trust 31.

Each life insurance trust at issue in this case owns a flexible premium, universal life insurance Phoenix Accumulator Universal Life ("PAUL") life insurance policy. *Id.* at 3. PHL is a Connecticut insurance company with its principal place of business in Hartford, Connecticut. *Id.* Phoenix is a New York life insurance corporation with its principal place of business in East Greenbush, New York. *Id.* Wilmington Savings Fund Society, FSB ("Wilmington Savings") is a Delaware citizen with its principal place of business in Wilmington, Delaware.

This case involves large face amount life insurance policies, which were purchased by the Defendants in the form of trusts that could later be sold on the secondary market. *Id.* at 8. These insurance plans were purchased via varying vehicles. One method was through non-

1

recourse premium financing, an arrangement in which a "lender would loan the insured funds to pay premiums in exchange for the insured pledging the policy as the sole collateral for the loan." *Id.* at 9. Another method was for the insured to establish a life insurance trust that would own the life insurance policy. *Id.*

The Plaintiffs' complaint alleges that the Defendants made a business decision not to honor policies it had sold to investors to stave off a financial crisis for the company. *Id.* at 22. The Plaintiffs contend that PHL further decided to "undermine or destroy the established efficient secondary market exchange for its policies and, leaving its policyholders with no alternatives, continue to collect premiums while trying to force the policyholders to lapse their policies." *Id.* The Plaintiffs contend that the Defendants decided that they would deny claims on the grounds that the policy lacks an insurable interest, independent of any determination of whether the plan in fact contained an insurable interest. *Id.* at 23.

Wilmington Savings has brought ten claims against the Defendants.

I.     Violation of 18 U.S.C. § 1962(b) (racketeering)

II.    Violation of 18 U.S.C. § 1962(c) (racketeering)

III.   Violation of 18 U.S.C. § 1962(d) (conspiracy for racketeering)

IV.    Fraud and Conspiracy

V.     Declaratory Judgment

VI.    Breach of Contract

VII.   Breach of Good Faith and Fair Dealing

VIII.  Promissory Estoppel

IX.    Violation of Connecticut Unfair Trade Practices Act

X.     Violation of California's Unfair Competition Law

2

The Defendants have moved for summary judgment on all of the claims with the exception of claim VI.

## LEGAL STANDARD

A well-pleaded complaint must contain more than mere labels and conclusions. *See Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544 (2007). The assumption of truth is inapplicable to legal conclusions or to "[t]hreadbare recitals of the elements of a cause of action supported by mere conclusory statements." *Iqbal,* 556 U.S. at 678. When determining whether dismissal is appropriate, the Court conducts a two-part analysis. *Fowler v. UPMC Shadyside,* 578 F.3d 203, 210 (3d Cir. 2009).

First, the factual and legal elements of a claim are separated. *Id.* The Court must accept all of the Complaint's well-pleaded facts as true, but may disregard any legal conclusions. *Id.* at 210-11. Second, the Court must determine whether the facts alleged in the Complaint are sufficient to show that the plaintiff has a "plausible claim for relief." *Fowler,* 578 F.3d at 211. In other words, the Complaint must do more than allege the plaintiff's entitlement to relief; rather, it must "show" such an entitlement with its facts. *Id.* A claim is facially plausible when its factual content allows the Court to draw a reasonable inference that the defendant is liable for the misconduct alleged. *See Iqbal,* 556 U.S. at 678. The plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'" *Id.* (quoting *Twombly,* 550 U.S. at 570).

When alleging fraud, Federal Rule of Civil Procedure 9(b) requires that the "party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P.

3

9(b). On a motion to dismiss under Rule 9(b) "focusing exclusively on [the rule's] particularity

language is too narrow an approach and fails to take account of the general simplicity and

flexibility contemplated by the rules." *Seville Indus. Mach. Corp. v. Southmost Mach. Corp.*,

742 F.2d 786, 791 (3d Cir. 1984) (internal quotation marks omitted). The Third Circuit has held

that:

> Rule 9(b) requires plaintiffs to plead with particularity the "circumstances" of the
> alleged fraud in order to place the defendants on notice of the precise misconduct
> with which they are charged, and to safeguard defendants against spurious charges
> of immoral and fraudulent behavior. It is certainly true that allegations of "date,
> place or time" fulfill these functions, but nothing in the rule requires them.
> Plaintiffs are free to use alternative means of injecting precision and some measure
> of substantiation into their allegations of fraud.

*Id.*

## DISCUSSION

### RICO Claims (Claims I, II, and III)

The Plaintiffs allege that the Defendants violated 18 U.S.C. § 1962(b). (D.I. 141 at 32).

The Defendants argue that the aforementioned claim should be dismissed because (1) the

Plaintiffs do not adequately plead either a Racketeer Influenced and Corrupt Organizations

("RICO") enterprise or that "Phoenix acquired or maintained control of it through racketeering

activity," (2) the RICO claims allege no predicate criminal conduct, and (3) the Plaintiffs' claim

lacks proximately caused damages. (D.I. 137 at 15-24).

*Claim I: 18 U.S.C. § 1962 (b)*

The Supreme Court has found that a RICO enterprise need only be a "continuing unit that

functions with a common purpose." *Boyle v. United States*, 556 U.S. 938, 939 (2009).

> Such a group need not have a hierarchical structure or a "chain of command";
> decisions may be made on an ad hoc basis and by any number of methods—by
> majority vote, consensus, a show of strength, etc. Members of the group need not

4

have fixed roles; different members may perform different roles at different times. The group need not have a name, regular meetings, dues, established rules and regulations, disciplinary procedures, or induction or initiation ceremonies. While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence. Nor is the statute limited to groups whose crimes are sophisticated, diverse, complex, or unique; for example, a group that does nothing but engage in extortion through old-fashioned, unsophisticated, and brutal means may fall squarely within the statute's reach.

*Id.* at 2245-46.   Thus, the enterprise need only have (1) a common purpose, (2) relationships

among those associated with the enterprise, and (3) sufficient longevity to complete the common

purpose.   *Id.*   Furthermore, the Supreme Court has made clear that the enterprise requirement is

to be read broadly.   *Id.*

The Third Circuit has provided guidance as to what constitutes a RICO enterprise.   In *In*

*re Ins. Brokerage*, the Third Circuit addressed two different association-in-fact enterprises.   *In*

*re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300 (3d Cir. 2010).   The Third Circuit first

addressed an enterprise in which "each defendant broker and its insurer-partners composed an

association-in-fact enterprise."   *Id.* at 373-74   The district court had found "that although

plaintiffs had adequately alleged bilateral agreements (regarding the steering of business and the

payment of contingent commissions) between each broker and its insurer-partners, plaintiffs had

failed to plead facts plausibly suggesting collaboration among the insurers.   The asserted hub-

and-spoke structures therefore lacked a unifying rim."   *Id.* at 374 (internal quotation marks

omitted).   The Third Circuit agreed.   *Id.*   In the case, the Plaintiffs had pled:

[T]hat each insurer entered into a similar contingent-commission agreement in order to become a "strategic partner"; that each insurer knew the identity of the broker's other insurer-partners and the details of their contingent-commission agreements; that each insurer entered into an agreement with the broker not to disclose the details of its contingent-commission agreements; that the brokers utilized certain devices, such as affording "first" and "last looks," to steer business

5

> to the designated insurer; and that, in the Employee Benefits Case, insurers adopted
> similar reporting strategies with regard to Form 5500.

*Id.* The Third Circuit found that, "Even under the relatively undemanding standard of *Boyle*,

[the aforementioned] allegations do not adequately plead an association-in-fact enterprise." *Id.*

The second alleged enterprise that the Plaintiffs asserted in *In re Ins. Brokerage* was an

insurance broker centered enterprise. *Id.* at 375. Regarding the insurance broker centered

enterprise the "plaintiffs allege a hierarchical structure according to which [the insurance

broker], in accordance with its broking plan, decided from which insurer each sham bid would be

requested." *Id.* at 376 (internal quotation marks omitted). The Third Circuit found that,

> [The] Plaintiffs adequately allege a "common interest" or "purpose," namely to
> increase profits by deceiving insurance purchasers about the circumstances
> surrounding their purchase. The alleged reciprocal bid rigging also adequately
> suggests "relationships among" the insurers "associated with the enterprises"; if
> proved, it would plausibly demonstrate the insurers 'joined together' in pursuit of
> the aforementioned common purpose.

*Id.* (internal citations and original brackets omitted). Furthermore, "[T]he complaint does allege

that one reason the insurers were willing to furnish sham bids was so that they would be the

beneficiaries of sham bids in the future." *Id.* at 377. This "alleged agreement by insurers to

provide sham bids plausibly suggests an interrelationship among the insurers—mediated through

[the insurance broker]—in pursuit of achieving greater business and profits by means of

deceiving insurance purchasers." *Id.* In other words, "the allegations of bid rigging provide the

'rim' to the [insurance broker]-centered enterprise's hub-and-spoke configuration, satisfying

*Boyle's* requirements." *Id.* at 375.

Here the Plaintiffs argue that they have sufficiently alleged the existence of an enterprise.

Specifically, the Plaintiffs allege that what they coin the "Phoenix Policy Exchange Enterprise"

("PPE") is an enterprise in fact. (D.I. 130 at 47). First, the Second Amended Complaint states

that the enterprise's purpose is the efficient exchange of life insurance policies. *Id.* Second, the complaint details the association between the various members of the exchange. *Id.* at 48-55. Third, the complaint alleges sufficient longevity as "at all relevant times the [PPE] has maintained the same structure . . . ." *Id.* at 55. The Defendants argue that the PPE is not an enterprise as it had no structure beyond that which naturally evolves in a market and that the members of the enterprise competed with each other. The Court agrees with the Defendants.

While the Supreme Court has provided an expansive definition of the term enterprise, it is clear that an enterprise must still be a group. Here, the Plaintiffs allege that the purported enterprise is composed of: "(i) sellers of Phoenix Policies; (ii) buyers of Phoenix Policies; (iii) representatives and agents assisting Sellers in selling Phoenix Policies; (iv) representatives and agents assisting Buyers in purchasing Phoenix Policies; and (v) individuals and entities providing services to Buyers and Sellers in connection with sales of Phoenix Policies." *Id.* at 48 (parentheticals omitted). However, this composition is no different from any other regulated or unregulated marketplace that deals in a single commodity. Furthermore, it is far less than the rimless hub-and-spoke structure that the Third Circuit discussed in *In re Ins. Brokerage* that was found not to be an enterprise, as here there does not even appear to be the requisite spokes. It cannot be that any group of individuals who buy and sell a commodity could satisfy the statute's requirement that there be an enterprise, as this would all but read out the applicable statutory requirement. Eighteen U.S.C. § 1962(b) requires the existence of an enterprise. Taking all the facts in the complaint as true, there is no enterprise. The Court grants the Defendants' Motion to Dismiss Claim I.

*Claim II: 18 U.S.C. § 1962(c)*

7

To plead a case under 18 U.S.C. § 1962(c) the Plaintiff must allege "(1) the conduct (2) of an enterprise (3) through a pattern of racketeering activity." *Salinas v. United States*, 522 U.S. 52, 62 (1997). An enterprise is defined in the statute as "include[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961. As discussed above, an association-in-fact enterprise exists when there is a "continuing unit that functions with a common purpose." *Boyle*, 556 U.S. at 948.

The Plaintiffs allege that that an enterprise existed consistent with the requirement of 18 U.S.C. § 1962(c) consisting of Phoenix and a network of agent-distributors. (D.I. 130 at 68, 69). Relevant portions of the Plaintiffs' complaint allege:

> Beginning in or about 2005 and continuing to the present, PHL, Phoenix Life and the Independent Agents who promoted, marketed and sold PAUL policies have comprised an association-in-fact enterprise (the "Fraudulent Billing Enterprise") associated together for a common, shared purpose of engaging in a course of conduct: (i) the promotion, marketing and sale of PAUL policies; (ii) the servicing of PAUL policies; and (iii) the billing and collection of premiums for PAUL policies. As discussed in detail below, beginning in or about 2009, the common and shared purpose of the Fraudulent Billing Enterprise and its members expanded to include fraudulently billing and collecting premiums from Plaintiffs and other investor-owners of PAUL policies issued by Defendants.

> . . . .

> The Independent Agents were integral members of the enterprise because they provided Defendants with access to customers, particularly affluent and high-net-worth customers, to whom Defendants otherwise would not have had access. Defendants sought out and recruited the Independent Agents based on their connections to non-recourse premium finance programs, the capital markets, investment banks, and other potential buyers of life insurance policies on the secondary market, because Defendants knew these Independent Agents could generate much higher premium revenue than other agents and could gain Defendants access to buyers wishing to later to sell their PAUL policies on the secondary market.

> . . . .

8

Plaintiffs are informed and believe, and upon such information and belief allege, that, at all relevant times herein, Phoenix Life's role in the Fraudulent Billing Enterprise has included the marketing, promotion and sale of PAUL policies, paying commissions for the PAUL policies sold by Defendants, proving reinsurance to PHL, and providing key business services for Fraudulent Billing Enterprise.

(D.I. 130 at 68-70).

The Defendants argue that there are no interpersonal relationships between the relevant parties as the brokers were independent and not captive to Phoenix, as demonstrated by the fact that they sold products from other insurers. (D.I. 137 at 18). Furthermore, the Defendants assert that the "brokers' alleged involvement was not even contemporaneous with the alleged acts of mail and wire fraud. The producers allegedly helped place the Policies in force between 2005 and 2008 by 'promoting, marketing, and selling' them. Yet, Plaintiffs assert that Phoenix made its supposed 'decision' to not pay death benefits in 2009, and committed the alleged mail and wire fraud after that decision." *Id.* The Plaintiffs contend that "Defendants' argument should be rejected because, contrary to their unsupported argument, 'independent agents' may be members in an associated-in-fact RICO enterprise." (D.I. 141 at 41 (internal citation and emphasis omitted)). While the Court agrees with the Plaintiffs that independent agents may in some circumstances be members of an association-in-fact RICO enterprise, sufficient facts to draw this conclusion were not pled here.

Other than the paying of commissions to the third party agents at the time of sale, the Plaintiffs point to no viable relationship between the third party agents and Phoenix. This is a far cry from *Levine v. First American Title Ins. Co.* where the district court found that independent agents may be members of an association-in-fact RICO enterprise. 682 F.Supp 2d 444 (E.D. Pa. 2010). In *Levine* the title agents served as an intermediary for the insurance

9

company. *Id.* at 449. Conversely, here the Plaintiffs have laid out no claim in the Second

Amended Complaint that the third party agents, after they sold the policies, continued to have

any role in the purported association-in-fact enterprise. This is especially true as the Plaintiffs'

RICO claims arise out of the theory that "PHL has overbilled Plaintiffs, and PHL and Phoenix

Life have overbilled other 'investors' policyholders, by fraudulently overstating the cost of

insurance ('COI') charges necessary to prevent their policies from lapsing." (D.I. 130 at 26).

Conversely, this case is like *In re Ins. Brokerage* where the plaintiff claimed that Defendants

may be connected by bilateral agreements, but made no allegation of collaboration among

agents. For the aforementioned reasons, the Court finds that the Plaintiffs have failed to plead

the required enterprise under 18 U.S.C. § 1962 (c) and therefore grants the Defendants' Motion

to Dismiss Claim II.

*Claim III: 18 U.S.C. § 1962 (d)*

Plaintiffs additionally claim that the Defendants conspired under 18 U.S.C. § 1962(d).

"[RICO conspiracy] is a conspiracy to violate RICO—that is, to conduct or participate in the

activities of a corrupt enterprise." *Zavala v. Wal Mart Stores Inc.*, 691 F.3d 527, 539 (3d Cir.

2012). As the Plaintiffs have failed to properly plead claims under 18 U.S.C. § 1962(b) or (c),

the Plaintiffs cannot make out a claim of conspiracy of these same acts. Therefore, the

Defendants' Motion to Dismiss Claim III is also granted.

**Fraud and Conspiracy (Claim IV)**

Fraud

The Plaintiffs allege three types of fraud. "First, after PHL had decided not to pay

Policy benefits, PHL fraudulently induced Plaintiffs to continue paying premiums by

misrepresenting that PHL would pay benefits upon the insured's death. Second, PHL concealed

10

and failed to disclose to Plaintiffs the decision not to pay death benefits. Third, PHL

fraudulently overbilled premiums." (D.I. 141 at 26). The Plaintiffs additionally allege that

"Phoenix life is liable for conspiring with PHL to commit the fraud." *Id.* Under Delaware law

a claim for fraud must allege five elements. *Schmeusser v. Schmeusser*, 559 A.2d 1294, 1297

(Del. 1989). These elements are:

> 1) a false representation, usually one of fact, made by the defendant;
>
> 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth;
>
> 3) an intent to induce the plaintiff to act or refrain from acting;
>
> 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation;
>
> 5) damage to the plaintiff as a result of such reliance.

*Id.*

The Plaintiffs have failed to plead both the aforementioned first and second elements. In

the Second Amended Complaint, the Plaintiffs state that a business decision was made to stop

paying death benefits for the Plaintiffs' policies, and yet continue to bill the Plaintiffs. (D.I. 130

at 102-28). FED. R. CIV. P. 9(b) requires that plaintiffs plead with such particularity that it

places the "defendants on notice of the precise misconduct with which they are charged. . . ."

*Seville Indus. Mach. Corp.*, 742 F.2d at 791. The relevant portion of Plaintiffs' pleading states:

> Among other things, Plaintiffs are informed and believe, and upon such information and belief allege, that, in or about 2009, PHL and Phoenix Life made a business decision that upon the death of a person insured under a PAUL policy issued by PHL owned by an investor:
>
>> a. PHL would refuse to pay the claim for death benefits if there was a transfer of the policy or a beneficial interest in the trust owning the policy;

11

> b. PHL would assert as a pretext for denying benefits that the policy
> purportedly lacked an insurable interest, and therefore was void ab initio,
> even if, in fact, PHL had not yet investigated insurable interest or PHL had
> investigated insurable interest and concluded that the subject policy did
> have an insurable interest under the law of the applicable state; and
>
> c. PHL would seek to retain the premiums paid for the policy by asserting
> that, because the policy purportedly lacked an insurable interest and was
> void ab initio, public policy allowed PHL to keep the premiums.

(D.I. 130 at 103).   This generic pleading is no more than attorney argument and devoid of any

facts sufficient to meet the requirements of FED. R. CIV. P. 9(b).   Unlike in *PHL Variable*, where

the Court found that the Plaintiffs had properly alleged fraud because,

> In pleading the alleged fraud, the Trust sets forth "the types of policies subject to
> the fraud, the names of agents who issued policies subject to the fraud, the
> existence of Phoenix's STOLI tracking spreadsheet that monitors the Trust, and
> corroborating sworn testimony from a former Phoenix life insurance producer.
> The Trust's counterclaim further alleges sufficient details to identify each of the
> policies, their face values, the premiums paid to date, and the premiums to be paid
> through the end of 2013.

*PHL Variable Ins. Co. v. ESF QIF Trust by & through Deutsche Bank Trust Co.*, 2013 WL

6869803, *7 (D. Del. Dec. 30, 2013).   Here, the Plaintiffs fail to allege who made the business

decision, when the business decision was made (the Plaintiffs fail to even confine the date of the

decision to a single year), how the business decision came to pass, or any other relevant

information that would be sufficient to put the Defendants on proper notice.   As the Plaintiffs

have failed to plead the existence of the business decision under FED. R. CIV. P. 9(b), it is not

possible for them to make out the required elements for fraud, as there is not support that the

Defendants made a false statement.   Therefore, the Court dismisses the Plaintiffs' fraud claim.

### Conspiracy

The Plaintiffs additionally allege that PHL conspired with Phoenix Life to defraud

Plaintiffs.   (D.I. 130 at 128).   As the Court has dismissed the underlying fraud claim, and the

conspiracy claim adds no further factual allegations, the conspiracy to defraud allegations are likewise insufficient. Therefore, the Court additionally grants the Defendants' Motion to Dismiss the Plaintiffs' conspiracy claim.

## Declaratory Judgment (Claim V)

The Plaintiffs seek a declaratory judgment on three issues: (1) that the policies are valid, (2) that Phoenix may not require completion of Phoenix's Certification and Acknowledgement of Trust Agreement Form, and (3) that the life insurance policies are transferable. The Defendants argue that the Plaintiffs do not have standing, that the issues are not ripe, that there are insufficient facts to find an insurable interest, that the opinion would be advisory, and that the opinion would be redundant.

### *That the policies have an insurable interest*

The Plaintiffs seek a declaration as to whether the "Policies had an insurable interest when issued by PHL or are void *ab initio* for lack of insurable interest."

#### Standing

"In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such." 28 U.S.C. § 2201.

> Determining whether declaratory judgment jurisdiction exists in a particular case requires consideration of the facts alleged, under all the circumstances, in order to evaluate whether they show that there is a substantial controversy between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

*PHL Variable Ins. Co.*, 2013 WL 6869803, at \*3. (internal quotation marks omitted). The Court

should look to "the adversity of the interest of the parties, the conclusiveness of the judicial

judgment and the practical help, or utility, of that judgment." *Step-Saver Data Sys., Inc. v. Wyse*

*Tech.*, 912 F.2d 643, 647 (3d Cir. 1990).

The Defendants claim that there is a lack of adversity because Plaintiffs simply "assert[]

that Phoenix's non-actionable and irrelevant litigation elsewhere somehow manifests its intent to

pursue identical claims against Plaintiffs with regard to these Policies." (D.I. 137 at 42). The

Plaintiffs assert that they not only "face a real, substantial and non-contingent threat of future

harm, which itself is sufficient [to] establish adversity, but they already have been harmed by a

diminution in the Policies' value." (D.I. 141 at 23).

> The Plaintiffs specifically argue the following:
>
> Defendants already have decided not to pay death benefits, and have implemented a practice of denying coverage under all policies, where, as here, the beneficial interest in the trust was transferred. (SAC ¶¶ 107, 110-119, 129-131, 133, 230-231, 275-276, 785.)
>
> PHL already has attempted to rescind or void six policies owned by trusts with the same trustee as Plaintiffs (including Policies owned by four Plaintiffs) and policies involving the same agents. (SAC ¶¶ 785, 120-121.)
>
> For each of the Policies, PHL already has made a business decision not to pay death benefits when the insured dies and to attempt to evade paying death benefits by asserting that the Policy lacks an insurable interest and is void ab initio. (SAC ¶¶ 784, 786; 108, 120, 122, 129-131, 133, 237-244, 248-249, 261, 279-286, 289-290, 303, 785.)
>
> PHL's pattern of refusing to pay benefits under similar policies, including several owned by Plaintiffs, has destroyed the market's confidence in the Policies and significantly diminished their value. (See, e.g., ¶¶ SAC 126-128.)

*Id.* at 22, 23.

The Court concludes that there is sufficient adversity between the parties for there to be

an actual, ripe controversy between the parties. This case is similar to *PHL Variable*. In *PHL*

*Variable* the court found that:

> The Trust's counterclaim adequately alleges a present injury: specifically, the harm
> to the Trust's assets—i.e., the interests in the Additional Policies—which allegedly
> results from Phoenix's pattern of litigating the validity of essentially identical
> policies it has issued, and doing so only after it has collected large premiums. The
> Trust expressly alleges that the fourteen Additional Policies share many of the same
> attributes as policies that Phoenix has challenged in the past, in this District and
> elsewhere. It appears that there have been at least 25 lawsuits across the country
> raising the same issue, including at least two others that involve Phoenix suing one
> or more of the same individuals participating on the Trust's side of the instant
> action.
>
> It is undisputed that, absent a declaration of rights in the context of the instant
> action, Phoenix will have the ability—at the time a claim is made on the Additional
> Policies—to challenge the Additional Policies as *void ab initio* due to lack of an
> insurable interest. Moreover, Phoenix is, in the instant action, challenging the
> validity of the Griggs Policy, and the Trust does not dispute that the challenge
> asserted by Phoenix presents an actual, ripe controversy. Under the circumstances
> as alleged in the Trust's counterclaim, the Court concludes that there is also an
> actual, ripe controversy when the Trust—as owner of nearly-identical Additional
> Policies also issued by Phoenix—seeks to prevent Phoenix from raising the same
> challenge to the validity of these Additional Policies.
>
> . . .
>
> Furthermore, a decision in the instant action as to whether the fourteen Additional
> Policies are supported by an insurable interest would define and clarify the rights
> the parties will have pursuant to the Additional Policies upon the occurrence of
> maturity events. Likewise, such a decision would have an immediate impact on
> the parties. Should the Trust prevail, the alleged marketability injury would be
> cured. Should Phoenix prevail, the Additional Policies will be void and the Trust
> may attempt to cease paying premiums on them.

*PHL Variable Ins. Co.*, 2013 WL 6869803 at *4 (internal quotation and citations omitted).

As in *PHL Variable*, this case involves virtually identical policies that were issued only

after the collection of large premiums, there are similar lawsuits scattered across the United

States, it is undisputed that the Defendants will have the right to challenge the policies as *void ab*

15

*initio*, a decision here would "define and clarify the rights" of the parties and would have an immediate impact, i.e., either the marketability injury of the policies would be cured or the trusts can cease paying premiums on void policies.

Furthermore, now is the most appropriate time to resolve this dispute. As the issue here is whether the polices are void *ab initio*, there is no additional information that would come into creation that would aid in the resolution of the matter. In fact, by waiting, relevant evidence may be lost. Furthermore, as the life insurance policy only matures upon the death of the insured, who may also be a key witness, determining whether there is an insurable interest now would promote the ultimate goals of justice.

### Adequacy of the Pleadings

The Defendants additionally allege that the Plaintiffs have inadequately plead sufficient facts to evaluate whether the life insurance planes have an insurable interests. The Defendants state that "other states' insurable interest laws are consistent with *Dawe*. . . ." (D.I. 137 at 32). Therefore, while various state law requirements may apply to the trusts, the Court will look to whether the pleadings meet the requirements of *Dawe* for the purposes of this motion.

"The insurable interest requirement serves the substantive goal of preventing speculation on human life." *PHL Variable Ins. Co. v. Price Dawe 2006 Ins. Trust, ex rel. Christiana Bank & Trust Co.*, 28 A.3d 1059, 1074 (Del. 2011). The insurable interest requirement applies only at the time that the policy was purchased and therefore does not prevent its subsequent sale or transfer. *Id*. The catch is that, "a third party cannot use the insured as a means or instrumentality to procure a policy that, when issued, would otherwise lack an insurable interest." *Id*.

16

Therefore, if a third party financially induces the insured to procure a life insurance contract with the intent to immediately transfer the policy to a third party, the contract lacks an insurable interest. Stated differently, if an insured procures a policy as a mere cover for a wager, then the insurable interest requirement is not satisfied.

*Id.* at 1075. Furthermore, the insured's right to purchase a policy and immediately transfer it is

not unqualified, but instead is "limited to bona fide sales of that policy taken out in good faith."

*Id.* It is for these reasons that courts must "scrutinize the circumstances under which the policy

was issued and determine who in fact procured or effected the policy." *Id.* at 1076.

The Plaintiffs have set forth a plausible case that the various trusts are not an illegal

wager. For example the complaint sets forth for Jane Doe 2:

327. Jane Doe 2 created Jane Doe Trust 2, a Delaware trust, on or about February 13, 2007. In the Jane Doe Trust 2 Agreement, Jane Doe 2 authorized the trustee of Jane Doe Trust 2 to "apply, in the name of the Trust, to be the absolute owner and beneficiary of a life insurance policy . . . under which [Jane Doe 2] shall be the Insured, from such life insurance company . . . as [Jane Doe 2] shall hereafter designate." The initial beneficiary of Jane Doe Trust 2 was Jane Doe 2's husband.

328. On or about February 13, 2007, an application for the Jane Doe 2 Policy was submitted to PHL. The application was signed by Jane Doe 2, the trustee of Jane Doe Trust 2, and a PHL agent. The application identified Jane Doe Trust 2 as the owner and beneficiary of the Jane Doe 2 Policy.

329. On March 1, 2007, PHL issued the Jane Doe 2 Policy to Jane Doe Trust 2, insuring the life of Jane Doe 2. The Jane Doe 2 Policy identified the "Owner, Beneficiary" as "As designated in the application," i.e., Jane Doe Trust 2. The Jane Doe 2 Policy was issued in Delaware.

330. By designating Jane Doe Trust 2 in the application as the owner and beneficiary of the Jane Doe 2 Policy, Jane Doe 2 funded Jane Doe Trust 2 with the Jane Doe 2 Policy.

331. After the Jane Doe 2 Policy was issued, the initial beneficiary of Jane Doe Trust 2, i.e., Jane Doe 2's husband, sold his interest in Jane Doe Trust 2 to the Retirement Fund.

332. At the time the Jane Doe 2 Policy was issued, the benefits under the Jane Doe 2 Policy were payable to a person having an insurable interest in Jane Doe 2,

i.e., Jane Doe 2's husband, as beneficiary of Jane Doe Trust 2, the owner and beneficiary of the Jane Doe 2 Policy. Jane Doe 2's husband had a substantial interest in Jane Doe 2's life engendered by love and affection.

333. If Jane Doe 2 had died after the Jane Doe 2 Policy was issued and before her husband sold his interest in Jane Doe Trust 2, the death benefit of the Jane Doe 2 Policy would have been payable to Jane Doe 2's husband, as beneficiary of Jane Doe Trust 2, the owner and beneficiary of the Jane Doe 2 Policy.

334. The Retirement Fund did not fund Jane Doe Trust 2 at any time prior to the date it acquired the interest in Jane Doe Trust 2.

335. Prior to PHL issuing the Jane Doe 2 Policy, there was no agreement between the Retirement Fund and Jane Doe 2, pre-negotiated or otherwise: (i) for the Retirement Fund to fund Jane Doe Trust 2, or (ii) for Jane Doe 2 or her husband to immediately transfer ownership of, or an interest in, the Jane Doe 2 Policy to the Retirement Fund.

(D.I. 130 at 132-34 (brackets and ellipses in original). While, the Defendants argue that the

Plaintiffs do not spell out whether the "insured had the financial wherewithal to pay premiums,"

the pleadings indicate that the investor did not fund the Trusts, which is sufficient for this stage

of the proceedings and is sufficiently specific under the pleading requirements as set forth in

*Twombly* and *Iqbal*. Therefore, the court finds that the Plaintiffs have properly plead sufficient

facts to find an insurable interest and, as the court has already concluded that the issue is ripe, the

Court denies the Motion to Dismiss the Declaratory Judgment for the determination of whether

there is an insurable interest.

### *Other Sought Declaratory Judgments*

The Plaintiffs additionally move the Court to address four other declaratory actions.

These declaratory judgments involve the increase in the cost of insurance, the ability of the

Plaintiffs to transfer the policies, and whether the Plaintiffs can be required to complete a form

listing any transfers of the trust. Even if there is standing for courts to hear a declaratory

judgment suit, the Declaratory Judgment Act "only gives a court the power to make a declaration

regarding the rights and other legal relations of any interested party seeking such declaration; it does not require that the court exercise that power." *Step-Saver Data Sys.*, Inc., 912 F.2d at 646-47 (internal quotation marks and citations omitted).

The Court declines to take up the remaining issues about which the Plaintiffs seek a declaratory judgment. The Court is not persuaded that the same evidentiary concerns mentioned in regards to the determination of whether there is an insurable interest exists here. Nor is the Court convinced that it could construct a declaratory judgment that could be efficiently enforced. For these reasons, the Court grants the Defendants' Motion to Dismiss the Declaratory Judgment for the other requested relief.

## Breach of Good Faith and Fair Dealing (Claim VII)

The Plaintiffs contend that PHL breached an implied covenant of good faith and fair dealing with the trusts that were issued from Delaware, California, Texas, and New Jersey. ("Independent Implied Covenant Claim Plaintiffs"). The Defendants argue that in Delaware, California, Texas, and New Jersey a good faith and fair dealing claim is only ripe once policy benefits are due. (D.I. 137 at 48). The Defendants further argue that, "[Independent Implied Covenant Claim] Plaintiffs attempt to side-step this requirement by alleging that Phoenix breached the implied covenant by increasing the cost of insurance and making the business decision to not ever pay benefits." *Id.* Finally, the Defendants argue that the Independent Implied Covenant Claim Plaintiffs are merely repackaging their breach of contract claim. The Independent Implied Covenant Claim Plaintiffs disagree, and argue that the breach of the covenant of good faith and fair dealing may be ripe prior to the time when the policy benefits are due.

19

The Court finds that the breach of the covenant of good faith and fair dealing claims are simply the repackaged breach of contract claims. For there to be a breach, the Independent Implied Covenant Claim Plaintiffs must "identify a specific implied contractual obligation that has allegedly been violated." *PHL Variable Ins. Co.*, 2013 WL 6869803 at * 8 (internal brackets and ellipses omitted). "General allegations of bad faith conduct are not sufficient." *Kuroda v. SPJS Holdings, L.L.C.*, 971 A.2d 872, 888 (Del. Ch. 2009). "Moreover, rather than constituting a free floating duty imposed on a contracting party, the implied covenant can only be used conservatively to ensure the parties' reasonable expectations are fulfilled." *Id.* (internal quotation marks omitted). Here the Independent Implied Covenant Claim Plaintiffs have failed to identify any such obligations. Instead, the Independent Implied Covenant Claim Plaintiffs have only generally stated that the Defendants breached the covenant of good faith and fair dealing by either not paying death benefits or causing policyholders to lapse or surrender their policies in bad faith. (D.I. 130 at 226-28). The Court refuses to read in such obligations into the contract without any allegations that the parties intended for such obligations to be part of the contracts. Thus, Claim VII is dismissed.

**Promissory Estoppel (Claim VIII)**

A subset of the Plaintiffs seek to enforce any policies declared void through the equitable doctrine of promissory estoppel. ("Promissory Estoppel Plaintiffs") *Id.* at 228-29. The Promissory Estoppel Plaintiffs allege that "PHL will be unjustly enriched by millions of dollars, and the Promissory Estoppel Plaintiffs will be unduly penalized, if the terms of the Promissory Estoppel Plaintiffs' Policies and/or PHL's promise to comply with its obligations under those Policies are not enforced." (D.I. 130 at 229). The parties disagree as to whether policies void *ab initio* can be enforced under a promissory estoppel theory.

20

"Certain agreements . . . are so egregiously flawed that they are void at the outset.   These

arrangements are often referred to as void *ab initio*. . . .   A court may never enforce agreements

void *ab initio*, no matter what the intentions of the parties." *Dawe*, 28 A.3d at 1067 (quotation

marks omitted).[1]   Therefore, as a contract that is void *ab initio* may not be enforced equitably

through estoppel, Defendants' Motion to Dismiss is granted as it pertains to this claim.

## California's Unfair Competition Law (Claim X)

Plaintiffs additionally claim that Phoenix violated California's Unfair Competition Law.

("CUCL") (D.I. 130 at 232, 230).   The California Supreme Court has held that "the [C]UCL

reaches any unlawful business act or practice committed in California." *Sullivan v. Oracle*

*Corp.*, 51 Cal. 4th 1191, 1208 (2011).   However, California has a presumption against

extraterritorial application.   *Id.*   For the CUCL the California Supreme Court has determined

that, "Neither the language of the [C]UCL nor its legislative history provides any basis for

---

[1] A Court's inability to breathe life into a void contract is universal for the state laws at issue in this case:

California:  Contracts void *ab initio* may not be enforced and "receive no help from the courts."   *Yoo v. Robi*, 126
   Cal. App. 4th 1089, 1104, 24 Cal. Rptr. 3d 740, 750 (2005).

New Jersey:  "Rescission voids the contract *ab initio*, meaning that it is considered 'null from the beginning' and
   treated as if it does not exist for any purpose."   *First Am. Title Ins. Co. v. Lawson*, 827 A.2d 230, 237 (N.J.
   2003).

Florida:  A contract that is void *ab initio* is unenforceable.   *Lopez v. Life Ins. Co. of Am.*, 406 So. 2d 1155, 1159
   (Fla. Dist. Ct. App. 1981) *approved sub nom. Life Ins. Co. of Georgia v. Lopez*, 443 So. 2d 947 (Fla. 1983).

Maryland: The doctrine of estoppel does not apply to contracts void *ab initio*.   *Beard v. Am. Agency Life Ins. Co.*,
   314 Md. 235, 259, 550 A.2d 677, 688 (1988).

Illinois:  "The difference between a contract that is void *ab initio* and one that is merely voidable is that a voidable
   contract can be ratified and enforced by the obligor, although not by the wrongdoer, while the void contract
   cannot be."   *Illinois State Bar Ass'n Mut. Ins. Co. v. Coregis Ins. Co.*, 355 Ill. App. 3d 156, 164, 821 N.E.2d
   706, 713 (2004) (internal quotation marks omitted).

Massachusetts:  "When a contract is void *ab initio*, the contract may not be enforced, and the court will treat the
   contract as if it had never been made."   *United States v. Mardirosian*, 602 F.3d 1, 7 (1st Cir. 2010) (internal
   quotation marks omitted)

Pennsylvania:  "[T]he courts of this Commonwealth will not be used to enforce contracts which violate public
   policy; such contracts are void and the law will have nothing to do with them."   *Am. Ass'n of Meat Processors
   v. Cas. Reciprocal Exch.*, 527 Pa. 59, 68, 588 A.2d 491, 496 (1991).

Texas:  "A void agreement has no legal effect and cannot be rendered enforceable by other means, such as waiver,
   quasi-estoppel, or ratification."   *Watts v. Pilgrim's Pride Corp.*, 2005 WL 2404111 (Tex. App. Sept. 30, 2005).

concluding the Legislature intended the [C]UCL to operate extraterritorially. Accordingly, the presumption against extraterritoriality applies to the [C]UCL in full force." *Id.* The California Plaintiffs allege that because the policies were purchased in California, the CUCL should apply. The Court disagrees. The policies were purchased prior to the alleged 2009 business decision and thus are not part of the alleged misconduct. Instead, all of the alleged misconduct occurred outside of California and therefore would not satisfy California's extraterritorial requirements. Therefore, the Defendants' Motion to Dismiss this claim is granted.

**Connecticut Unfair Competition Law (Claim IX)**

Plaintiffs assert that the Phoenix violated the Connecticut Unfair Trade Practices Act. ("CUTPA") (D.I. 130 at 229-32). Specifically, the Plaintiffs allege that the Defendants violated Connecticut General Statutes §§ 42-110a et seq. and §§ 38a-815 et seq.

The Defendants make three arguments. First, the allegation that Phoenix violated subsection six is not ripe, because it "prohibits '[u]nfair claim settlement practices,' which, by definition, can only take place after the insured has died and a claim to the death benefit has been submitted." (D.I. 137 at 47 (emphasis omitted)). The Court agrees. As a life insurance policy by definition cannot be settled until after the death of the insured, a claim under § 38a-816(6) is not ripe until the claim has been settled. Second, the Defendants argue that there cannot be a claim under § 38a-816(1), because it would be based on the same fraudulent conduct underlying the Plaintiffs' fraud and RICO claims, which Defendants argue is insufficient to state a claim. The Plaintiffs respond that the CUTPA claim is not based on the fraud claim as it is not necessary to plead fraud in order to plead a CUTPA claim. (D.I. 141 at 48). The Defendants do not respond to this argument. (D.I. 142 at 23). The Supreme Court of Connecticut has determined that "knowledge of falsity, either constructive or actual, need not be proven to

22

establish a violation of CUTPA." *Kim v. Magnotta*, 733 A.2d 809, 816 (1999). Therefore, the Court finds the Defendants' argument here to be unpersuasive. Third, the Defendants argue that damages are not properly plead because the Plaintiffs seek all premiums paid under the policies. (D.I. 137 at 48). The Court disagrees. The Plaintiffs have properly set forth an amount of damages and it is far too early at this stage to assess whether the evidence will be sufficient to justify the amount of damages that the Plaintiffs are seeking.

Therefore, the Defendants' Motion to Dismiss the Plaintiffs' § 38a-816(6) is granted and the Defendants' Motion to Dismiss the Plaintiffs' § 38a-816(1) claim is denied.

## CONCLUSION

For the reasons above, the Court will **GRANT IN PART** and **DENY IN PART** the Defendants' Motion to Dismiss the Second Amended Complaint (D.I. 136). An appropriate order will be entered.

23